UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

INDIA M. o/b/o K.J.,[1]

                              Plaintiff,               **DECISION AND ORDER**

v.

                                                     6:20-cv-06230 (JJM)

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

        This is an action brought pursuant to 42 U.S.C. §1383(c)(3) to review the final determination of the Commissioner of Social Security that K.J., a minor, was not entitled to Supplemental Security income ("SSI"). Before the court are the parties' cross-motions for judgment on the pleadings [10, 11].[2] The parties have consented to my jurisdiction [13]. Having reviewed their submissions [10, 11, 12], the Commissioner's motion is granted.

## BACKGROUND

        The parties' familiarity with the 357-page administrative record [9] is presumed. K.J. was diagnosed with scoliosis of the spine. Id., p. 260.  She received treatment for her scoliosis from orthopedic surgeon James O. Sanders, M.D. and her primary care physician, Matthew M. Carlin, M.D.  See id., pp. 260, 242-44.  X-rays revealed that the curvature of K.J.'s

---

[1]     In accordance with the guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Western District of New York on November 18, 2020 in order to better protect personal and medical information of non-governmental parties, this Decision and Order will identify the plaintiff by first name and last initial.

[2]     Bracketed references are to the CM/ECF docket entries. Page references to the administrative record are to the Bates numbering.  All other page references are to the CM/ECF pagination (upper right corner of the page).

spine grew progressively more severe from 2014 through 2016.  See id., pp. 246, 281, 282, 319, 321.  She underwent a posterior spinal fusion surgery with instrumentation from T2 through L2 on November 28, 2016.  Id., pp. 330-32.  Dr. Sanders discharged her from the hospital following her surgery with the following instructions:

> "You should also be continuing to increase your daily walking.  A gradual increase is recommended each day, aiming for about 2-15 minute walks each day by 2 weeks and then 1-30 minute[s] by 4 weeks.  You should also work to increase your time up during the day in preparation for returning to school at 6 weeks.  You should also avoid lifting anything heavier than 10 pounds until cleared by Dr. Sanders."

Id., p. 332.  With respect to school activities, Dr. Sanders advised K.J. to receive "[h]ome tutoring for 6 weeks" and that there was to be "[n]o participation in physical education class or rough, contact sports for 3 months".  Id., p. 333.  After surgery, K.J.'s mother requested a follow-up appointment with Dr. Sanders' office due to a "recent fall with increasing pain in her back".  Id., p. 342.  However, upon examination on December 9, 2016, K.J. was "in no distress", sat "comfortably on the exam table", was "able to move off the exam table with ease" and had a "smooth gait".  Id.  Her incision was "healing well" and she was "only mildly tender to palpation along the incision bilaterally".  Id.  K.J. and her father stated that her pain was "well-controlled".  The examining physician's assistant, Kailee M. Spusta, did "not see any reason to get repeat x-rays today, as [K.J.] does not have any complaints of pain".  Id., p. 343.  She discussed with K.J. and her father "that they could work on spacing [K.J.'s] hydrocodone doses out closer to 6 hours" and "work on substituting ibuprofen in place of the hydrocodone".  Id.

X-rays on January 10, 2017 showed "intact posterior spinal fixation hardware" with "no acute abnormality"; and again on February 21, 2017 showing "stable" [b]ilateral posterior spinal fusion from T2 through L2" with "no hardware complication".  Id., pp. 344-45.

K.J.'s "[m]ild underlying residual curvature [was] unchanged". Id., p. 345. Although the x-ray reports list Dr. Sanders as the attending physician, no treatment notes from those dates appear in the record.

Dr. Carlin examined K.J. on May 9, 2018 for a well child visit. Id., p. 347. K.J. reported that she was physically active and participated in dance. Id. Her parents had "no specific concerns" at the time. Id. She was not taking any medications at the time. Id., p. 348. Upon examination, her spine exhibited "some scoliosis" and a "surgical scar". Id. Her reflexes were "present and symmetric". Overall, Dr. Carlin assessed the examination as a "routine child health examination without abnormal findings". Id. However, he noted that K.J. was "overdue for orthopedics follow-up with Dr. Sanders" and encouraged the family "to call and schedule a follow-up visit". Id. In a form that K.J. completed as part of her visit, she described herself as "active" and stated that she would like to be a dance teacher for a career. Id., p. 352.

At the time of K.J.'s hearing before the ALJ on October 25, 2018, her mother reported that K.J. no longer saw Dr. Sanders, and that she had not yet obtained an appointment for the follow-up visit with Dr. Sanders that Dr. Carlin previously recommended. Id., pp. 51, 54. K.J.'s mother testified that "severe scoliosis" was K.J.'s only difficulty, but that surgery had helped K.J. "for the most part". Id., p. 51. K.J. testified that surgery helped her "feel more supportive, kind of". Id., p. 60. K.J.'s symptoms at the time of the hearing, as reported by her mother, included "intermittent" back pain. Id., p. 51. K.J. reported having trouble bending over and sits down to tie her shoes. Id., p. 61. She was able, however, to bathe and dress herself. Id. She babysits her younger sister and gives her a bath. Id., pp. 61-62. K.J.'s mother stated that K.J.'s doctors advised her to no longer do gymnastics, which she previously enjoyed. Id., p. 51. At the doctor's suggestion, plaintiff signed up K.J. for dance to "help strengthen her core". Id. at

52. K.J. testified that she could not "do some of the things that my friends do", like dance and gymnastics, but that she is able to run. Id., pp. 62-63. Plaintiff reported no problems with K.J.'s academics and stated that K.J. has a core group of friends that she hangs out with and talks to every day. Id., p. 52. K.J. does chores around the house. Id., pp. 53-54. The only doctor K.J. sees is her pediatrician, Dr. Carlin. Id., p. 54.

Prior to issuing his decision, ALJ Carl E. Stephan requested, and received, additional records from Dr. Carlin. See id., pp. 305-57. ALJ Stephan found in his January 24, 2019 Decision that scoliosis of the spine was K.J.'s lone severe impairment and that there was no medical evidence that K.J.'s impairment satisfied the requirements of any listing.[3] Id., pp. 30-31. In addition, he found that K.J. did not have an impairment or combination of impairments that functionally equal the severity of the listings. Id., pp. 31-40. Specifically, he concluded that K.J. had a "less than marked limitation in health and physical well-being" (id., p. 39), but no limitations in the remaining five functional domains used to evaluate disability in children (id., pp. 34-39): acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulation of objects, and caring for yourself.

In reaching that determination, ALJ Stephan gave "significant weight" to Dr. Sanders' post-operative instructions and to the June 28, 2016 opinion of consultative examiner Rita Figueroa, M.D. that K.J. had "moderate limitations with respect to repetitive bending, twisting, and turning". Id., p. 34. In addition, he accorded "significant consideration" to the August 8, 2016 opinion of J. Meyer, M.D., a non-examining physician, that K.J. had a "less than marked" limitation in the domain of health and physical well-being, but no limitations in any other functional domain. Id.

---

[3] Plaintiff does not challenge this finding.

Because K.J. did not have an impairment or combination of impairments that resulted in either "marked" limitations in two domains of functioning or an "extreme" limitation in one domain of functioning, ALJ Stephan concluded that she did not meet the Social Security Act's definition of disability. Id., pp. 40. Thereafter, this action ensued.

## DISCUSSION

In seeking remand for further administrative proceedings, K.J. argues that ALJ Stephan erred by failing to develop the record with a post-surgical functional assessment and because he failed to advise plaintiff, who was not represented at the hearing, of the importance of obtaining current functional opinion evidence from K.J.'s treating physicians. Plaintiff's Memorandum of Law [10], pp. 7. In addition, plaintiff argues that the functional opinions of Drs. Figueroa and Meyers were not substantial evidence because they were issued prior to K.J.'s surgery and were stale. Id., pp. 7-8.

**A.     Standard of Review**

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

**B.     Infant Disability Standard**

A claimant under 18 years of age, such as K.J., is "disabled" under the Social Security Act if she has a medically determinable physical or mental impairment (or combination

of impairments) that result in "marked and severe functional limitations . . . which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §1382c(a)(3)(C). Under the applicable regulations, K.J. must show that she is not working, that she has a "severe" impairment or combination of impairments, and that the impairment or combination of impairments is of listing-level severity - *i.e.*, medically or functionally equal to the severity of a listed impairment. 20 C.F.R. §§416.924(a)-(d).

Functional equivalence of limitations in children is evaluated on six domains: acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for oneself; and health and physical well-being. 20 C.F.R. §416.926a(b)(1)(i)-(vi). Marked limitations in two domains of functioning or an extreme limitation in one domain constitutes a functional equivalent to a listed impairment. Id. §416.926a(d). "Marked" limitation for a domain is when a claimant's "impairment(s) interferes seriously with your ability to independently initiate, sustain, or complete activities." Id. §416.926a(e)(2)(i).

**C.     ALJ Stephan Sufficiently Developed the Record**

"Although the claimant has the general burden of proving that he or she has a disability within the meaning of the Act, because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record. This duty to develop the record exists even when the claimant is represented by counsel." Munerlyn v. Colvin, 203 F. Supp. 3d 253, 263-64 (W.D.N.Y. 2016); Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999). When a plaintiff proceeds before the ALJ *pro se*, the ALJ's duty is heightened. Moran v. Astrue, 569 F.3d 108, 113 (2d Cir. 2009). In the case of a minor seeking SSI benefits, the Commissioner's regulations state that "whenever

possible and appropriate" the ALJ "will try to get information from people who" can provide information concerning the effects of the claimant's impairments on his or her activities of daily living. 20 C.F.R. §416.924a(a)(2).

The extent of the ALJ's duty to develop the record is a factual inquiry dependent upon the plaintiff's impairments and whether the medical evidence in the record is deficient. *See, e.g.*, Moran, 569 F.3d at 114 ("[i]n light of the meager record and Moran's manifest debilitating condition, it was especially important for the ALJ to help Moran develop a testimonial record of the critical events"); Velez v. Colvin, 2016 WL 8671963, *6 (W.D.N.Y. 2016) (noting that the Second Circuit's holdings in Tankisi v. Commissioner, 521 Fed. Appx. 29 (2d Cir. 2013) and Pellam v. Astrue, 508 Fed. Appx. 87 (2d Cir. 2013) were fact specific and holding that "under these circumstances which included vagueness in the record . . . as well as a claimant with a mental impairment, it was incumbent upon the ALJ to advise the plaintiff of the importance of obtaining functional assessments from her treating physicians"). Further, an ALJ is not required to request additional evidence where the report of a consultative examiner, coupled with other medical evidence, is sufficient to support his or her conclusions. Tankisi, 521 Fed. Appx. at 34.

Where the record is bereft of any functional assessment of a plaintiff's functional abilities, or where the only functional assessments are stale, the ALJ has an obligation to develop the record with a functional assessment. *See, e.g.* Girolamo v. Colvin, 2014 WL 2207993 (W.D.N.Y. 2014) ("[a] stale medical opinion does not constitute substantial evidence to support an ALJ's findings"); Clute ex rel. McGuire v. Commissioner of Social Security, 2018 WL 6715361, *5 (W.D.N.Y. 2018). However, "[t]he mere passage of time does not render an opinion stale. Instead, a medical opinion may be stale if subsequent treatment notes indicate a

claimant's condition has deteriorated." Whitehurst v. Berryhill, 2018 WL 3868721, *4 (W.D.N.Y. 2018); Cruz v. Commissioner of Social Security, 2018 WL 3628253, *6 (W.D.N.Y. 2018) ("consultative examination is not stale simply because time has passed, in the absence of evidence of a meaningful chan[ge] in the claimant's condition"). *See also* Pritchett v. Berryhill, 2018 WL 3045096, *8 (W.D.N.Y. 2018) ("[i]f a claimant's status regarding her impairments undergoes '*significant deterioration*' after a consultative examination, the examination may not constitute substantial evidence" (emphasis added)); Andrews v. Berryhill, 2018 WL 2088064, *3 (W.D.N.Y. 2018) (same). "A medical opinion based on only part of the administrative record may still be given weight if the medical evidence falling chronologically . . . after the opinion demonstrates substantially similar limitations and findings." Pritchett, 2018 WL 3045096, *8.

Here, the record contained a functional assessment from Dr. Figueroa. Plaintiff argues that Dr. Figueroa's opinion – issued prior to K.J.'s surgery – was stale. Plaintiff's Memorandum of Law [10], pp. 7-8. I disagree. The medical evidence demonstrates that K.J.'s condition did not deteriorate following her November 28, 2016 surgery. To the contrary, the evidence demonstrates that surgery improved K.J.'s condition. For example, K.J. was seen in Dr. Sanders' office on December 9, 2016 for an "urgent evaluation" following "a recent fall with increasing pain". Administrative Record [9], p. 342. However, as discussed more fully above, upon examination by PA Spusta, K.J. did "not recall a recent fall", was "in no distress", was able to sit "comfortably on the exam table" and "to move off the exam table with ease". Id. K.J. had no complaints of pain. Id. X-rays taken on January 10, 2017 showed "[i]ntact posterior spinal fixation hardware" with "[n]o acute abnormality". Id., p. 344. X-rays taken February 21, 2017[4]

---

[4] Although the existence of x-ray reports from January 10, 2017 and February 21, 2017 with Dr. Sanders listed as the attending provider suggests plaintiff was seen by Dr. Sanders' office on those dates, no treatment notes from those dates appear in the record. However, plaintiff does not raise this as a basis

demonstrated that K.J.'s "spinal fusion from T2 through L2" was "stable" with "no hardware complication". Id., p. 345. Compared to the January 10, 2017 x-ray, K.J.'s "[m]ild underlying residual curvature [was] unchanged". Id.

Five months later, at her May 9, 2018 well child visit with Dr. Carlin, K.J.'s parents had "no specific concerns", and K.J.'s extracurricular activities included "dancing". Id., p. 347. Upon examination, her spine showed "some scoliosis" and her surgical scar. Id., p. 348. Overall, her visit was a "routine child health examination without abnormal findings". Id. Dr. Carlin noted that K.J. was "overdue" for her post-operative orthopedics follow-up visit with Dr. Sanders and was not taking any medications. Id. Nothing in Dr. Carlin's treatment note suggests K.J. was dealing with any persistent symptoms, pain, or loss of function due to her scoliosis.

Testimony from both K.J. and her mother suggested no post-surgical deterioration in K.J.'s condition. K.J.'s mother testified that the surgery helped K.J. "[f]or the most part". Id., p. 51. K.J. herself testified that the surgery "made me feel more supportive". Id., p. 60. Although over 5 months had elapsed since K.J.'s well child visit, K.J.'s mother had still not secured a follow-up appointment with Dr. Sanders, notwithstanding her testimony that K.J. continued to have "intermittent" pain. Id., p. 51. K.J.'s mother testified that "the doctor" advised K.J. to no longer participate in gymnastics or to "[p]lay on her feet too hard". However, she did not identify any other activities her daughter was unable to perform. Id., pp. 51-52. K.J. had no problems with academics and had a core group of friends. Id., p. 52. She was able to do household chores (id., p. 53) and dress and bathe herself (id., p. 61). She was able to run. Id., p. 63. She helped out at home by babysitting and bathing her younger sister. Id., pp. 61-62. The

---

for remand, nor does she assert that Dr. Sanders imposed any restrictions upon her during those (presumed) visits greater than those reflected elsewhere in the record.

only things she identified that she could not do were dance and gymnastics. Id., p. 62. She has "trouble bending over" but was able to tie her own shoes. Id., pp. 60-61.

ALJ Stephan relied upon, and specifically cited, this evidence to arrive at his conclusions. See id., pp. 32-34. Nothing in the record suggests K.J. had difficulties beyond those identified by Dr. Figueroa. Moreover, K.J., who is now represented by counsel, does not identify in her papers any loss of function or any missing record that ALJ Stephan should have, but did not, consider. Even if ALJ Stephan had solicited – and received – a functional assessment from Dr. Carlin and/or Dr. Sanders, there is nothing in their treatment notes, or in the testimony of K.J. or her mother, that suggests K.J. has an extreme limitation in any of the functional domains, or a marked limitation in two or more.

Under these circumstances, I find that ALJ Stephan did not err by failing to obtain a functional assessment from Dr. Carlin or Dr. Sanders, or to advise K.J. to do so. In addition, I find that substantial evidence supports ALJ Stephan's determination that K.J.'s impairments do not meet the definition of disability under the Social Security Act.

## CONCLUSION

For these reasons, the Commissioner's cross- motion for judgment on the pleadings [11] is granted and plaintiff's motion [10] is denied.

**SO ORDERED**.
Dated: September 21, 2021

          /s/ Jeremiah J. McCarthy
          JEREMIAH J. MCCARTHY
          United States Magistrate Judge